Karole K. JENSEN, as Administratrix of the Estate of Michael Clark, Deceased, Plaintiff,

v.

Virgil L. CONRAD, in his individual and official capacity as Commissioner of the Department of Social Services;

Mary D. Dusenberry, George D. Hamilton, Oscar P. Butler, Ph.D., John C. Williams, Jr., Lucy C. Thrower, Agnes Wilson, Ph.D., and W. Jerry Fedder, individually and in their official capacities as members of the State Board of the Department of Social Services;

Jerry Herd, Harold E. Simpson, Ophelia W. Smith, J. Furman Gerrard, and Odell Short, individually and in their official capacities as members of the Anderson County Board of the Department of Social Services;

Kenneth Pryor, individually and in his official capacity as Director of the Anderson County Department of Social Services;

Dawn Hawkins, individually and in her official capacity as Program Director for Human Services of the Anderson County Department of Social Services; and

Susan Straup, individually and in her official capacity as Protective Services Supervisor of the Anderson County Department of Social Services, Defendants.

Civ. A. No. 82–2059–14.

United States District Court,
D. South Carolina,
Anderson Division.

June 16, 1983.

Motion for Reconsideration Aug. 24, 1983.

O. Fayrell Furr, Jr. and Charles L. Henshaw, Jr., Columbia, S.C., for plaintiff.

Joel H. Smith, William C. Hubbard, John L. Choate, Henry S. Knight, Jr., Nelson, Mullins, Grier & Scarborough, Columbia, S.C., for Virgil L. Conrad, in his individual and official capacity as Commissioner of the Department of Social Services; Mary D. Dusenberry, George D. Hamilton, Oscar P. Butler, Ph.D., John C. Williams, Jr., Lucy C. Thrower, Agnes Wilson, Ph.D., and W. Jerry Fedder, individually and in their official capacities as members of the State Board of the Dept. of Social Services.

Wilburn Brewer, Jr., James Lynn Werner, Nexsen, Pruet, Jacobs & Pollard, Columbia, S.C., for Jerry Herd, Harold E. Simpson, Ophelia W. Smith, J. Furman Gerrard, and Odell Short, individually and in their official capacities as members of the Anderson County Board of the Department of Social Services; Kenneth Pryor, individually and in his official capacity as Director of the Anderson County Dept. of Social Services.

H. Grady Kirven, Steven C. Kirven, Watkins, Vandiver, Kirven, Gable & Gray, Anderson, S.C., for Dawn Hawkins, individually and in her official capacity as Program Director for Human Services of the Anderson County Dept. of Social Services.

George C. Beighley, Richardson, Plowden, Grier & Howser, Columbia, S.C., for Susan Straup, individually and in her official capacity as Protective Services Supervisor of the Anderson County Dept. of Social Services.

## ORDER

WILKINS, District Judge.

This matter is before the Court on motions to dismiss filed pursuant to Fed.R. Civ.P. 12(b)(6) by members of the Boards of the State Department of Social Services and Anderson County Department of Social Services. On January 24, 1983, a hearing was held on these motions. Shortly thereafter, affidavits were filed by movants reaching the merits of Plaintiff's claim. Consequently, the Court notified the parties that the pending motions to dismiss would be viewed as motions for summary judgment under Fed.R.Civ.P. 56(b) and provided Plaintiff an opportunity to file responsive affidavits. Having now fully considered the additional affidavits and legal briefs offered by both parties, the Court is of the opinion that summary judgment should be entered in favor of movants.

## FACTS

This action arises out of the death by beating of Michael Clark, a three-year-old child, apparently by the live-in boyfriend of Michael's mother.[1] The Anderson County Department of Social Services became involved prior to Michael's death when it received a report on February 28, 1980 from the Principal of New Prospect Elementary School concerning the possible abuse of Michael's older brother. A protective service caseworker was subsequently sent to the

---

1. See generally the report of the investigation into the death of Michael Clark entitled "Report of Investigations of Circumstances Surrounding the Deaths of Certain Children in South Carolina Directly Resulting from Physical Abuse and Neglect or Abandonment."

school to investigate the matter. Based on the caseworker's interview with the child and his teacher, she apparently decided that the family should be officially contacted. However, after repeated attempts, she failed to locate the home. Consequently, after the expiration of 60 days, the case was classified as "unfounded" and officially closed. No further action was taken by the Anderson County Department of Social Services prior to Michael's death on June 23, 1980.[2]

■ The essence of Plaintiff's resulting Complaint against movants seems to be that the Board of the State Department of Social Services failed to provide proper training for protective service caseworkers in violation of state law and that the Board of the Anderson County Department of Social Services hired caseworkers who were inadequately trained.[3] The claim that protective service caseworkers were inadequately trained arises primarily from the allegation that Michael's home was never located even though his correct address was readily available through several sources in the community, including the School District Headquarters and the County Food Stamp Office. Plaintiff specifically maintains that Michael's death was not prevented, as it could have been through proper protective service intervention, because caseworkers were not taught essential investigatory techniques necessary to locate the parents or guardians of children who are suspected to be victims of abuse. In support of this contention, Plaintiff has submitted the affidavits of three former certified protective service caseworkers stating that the necessary skill and knowledge to locate transitory or evasive families

is not taught in the current training curriculum.[4]

Plaintiff alleges further that this failure to properly train protective service caseworkers has resulted in "a pattern of cases throughout the state"[5] in which the Department of Social Services has failed to properly and timely intervene to prevent child abuse. In an attempt to support this contention, Plaintiff has submitted a document entitled "Report of Investigations of Circumstances Surrounding the Deaths of Certain Children in South Carolina Directly Resulting from Physical Abuse and Neglect or Abandonment." This document is primarily a report of an investigation conducted by the South Carolina Attorney General's Office into the deaths of ten children due to abuse or neglect occurring in the state between February, 1978 and June, 1980. In each case, the protective actions undertaken by various county social services officials were critically examined.

In support of its training program, movants have submitted the affidavits of Wayne Holder, an expert in protective services training; Ramona L. Foley, the State Project Administrator for Child Protective Services and Permanency Planning; and Shirley H. Fitz-Ritzon, the State Director of Child Protective Services. Mr. Holder is the Director of the Children's Division of the American Humane Association (AHA) which was hired by the state in 1977 to develop a comprehensive training program for protective service caseworkers. Mr. Holder states that a comprehensive training program was developed by the AHA and put into operation in 1978.[6] Based on his personal experience in protective service training in every region of the nation, he states that as a result of this program

---

2. While Michael's brother was the subject of the report of child abuse, Plaintiff maintains that had this report been properly investigated, Michael's death would have been prevented.

3. Plaintiff does raise several other allegations in her Complaint which are not specifically related to training. However, these allegations are not sufficiently particularized under *Smith v. Ambrogio,* 456 F.Supp. 1130 (D.Conn.1978), to justify the extensive litigation which would

be involved in this action. As such, they must be dismissed as insubstantial claims.

4. See affidavits of Betty Flowers, ¶ 6; Nancy Sadler, ¶ 5; Robin Campbell, ¶ 6.

5. See Plaintiff's Memorandum of Detailed Allegations, ¶ 13(d).

6. See affidavit of Wayne Holder, ¶¶ 3, 5.

South Carolina clearly provides greater training in this area than is currently being provided on the national average.[7] Moreover, in his words, the state is "perceived as a pioneer in the area of child protection staff development."[8] Finally, Mr. Holder also states that, in his opinion, current training in South Carolina is adequate to provide protective service caseworkers with the necessary knowledge and skill to properly perform their jobs.[9]

Both Ms. Foley and Ms. Fitz-Ritzon appear to share Mr. Holder's opinion concerning the adequacy of current protective service training in the state. Each, as a result of their jobs with the State Department of Social Services, is familiar with the specific details of the training program. In describing the program, both state in their respective affidavits that it is a two-week broad-based training course covering topics including but not limited to "identifying good parenting characteristics; identifying proper child development; identifying characteristics of abusive and neglectful families; necessary information gathering; initial family contact; *location of the family;* assessment of risk; basic interviewing skills; identifying abuse injuries as opposed to accidental injuries; basic fact gathering; and proper use of foster care systems." (Emphasis added.)[10] All protective service caseworkers are required to complete this course and must pass a knowledge exam on the information presented in order to receive certification.[11] Moreover, regulations prohibit caseworkers from investigating cases involving suspected child abuse prior to receiving certification. Lastly, the program also requires annual recertification of protective service caseworkers based on continuing educational requirements.[12]

7. *Id.,* ¶¶ 11–12.

8. *Id.,* ¶ 11.

9. *Id.,* ¶ 13.

10. See affidavit of Ramona Foley, ¶ 12. Also see affidavit of Shirley Fitz-Ritzon, ¶ 12.

11. *Id.,* ¶ 13.

12. Several features of the training program were apparently considered highly innovative

## LAW

When an individual, particularly a child, is placed under the care, custody or supervision of a state governmental agency charged with a duty under state law to provide for his welfare, the failure of his governmental custodians to undertake reasonable action to protect him from obvious dangers may constitute a cause of action under 42 U.S.C. § 1983. *Doe v. New York City Department of Social Services,* 649 F.2d 134, 141 (2d Cir.1981); *see generally, Orpiano v. Johnson,* 632 F.2d 1096, 1101 (4th Cir.1980); *Withers v. Levine,* 615 F.2d 158 (4th Cir.1980). Of course, a Section 1983 claim may not be based simply on the allegation that governmental officials violated state law in failing to take appropriate protective measures. In order to state a claim under Section 1983, it is necessary to allege a violation of federal constitutional or statutory rights. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *Ogilbee v. Western District Guidance Center, Inc.,* 658 F.2d 257, 258 (4th Cir.1981). In this case, the due process clause of the fourteenth amendment constitutes an appropriate federal basis for the claim. *See Jones v. The Board of Governors of the University of North Carolina,* 704 F.2d 713, 717 (4th Cir.1983).

Under the due process clause, an individual legally entrusted to the care or protection of governmental officials has a right not to suffer injury as a proximate result of the failure of those officials to render reasonable care or protection due to their "deliberate indifference" to his welfare. *Doe v. New York City Department of*

when developed in 1977. For example, among other achievements, the South Carolina program was the first in the nation to: (1) constitute a comprehensive training program based on competency, (2) require passage of a knowledge exam by all protective service caseworkers prior to receiving and investigating referrals, and (3) establish educational requirements for recertification. See affidavit of Wayne Holder, ¶¶ 4, 12.

*Social Services,* 649 F.2d at 141; *Orpiano v. Johnson,* 632 F.2d at 1101.[13] Governmental officials may be held to have acted with deliberate indifference toward an individual under their care if it is established that they intentionally caused him harm, knowingly allowed others to harm him, or acted with conscious indifference to his safety.[14]

In defining the concept of deliberate indifference, it is important to recognize that although it is closely associated with gross negligence, there is a significant distinction. *See Doe v. New York City Department of Social Services,* 649 F.2d at 143. In essence, gross negligence is the breach of reasonable standards of conduct posing obvious dangers to others while deliberate indifference involves a knowing lack of regard or concern for the safety of others. In the context of governmental care or custody, deliberate indifference involves the intentional failure of governmental officials assigned to the protection of an individual to concern themselves with that individual's welfare. *Orpiano v. Johnson,* 632 F.2d at 1101. A governmental official may act with gross negligence toward an individual placed in his care by inadvertently exposing him to obvious and extreme dangers. However, unless that official was actually aware of the dangers involved and failed to act to provide reasonable protection due to a conscious lack of concern for the individual's safety, the official did not act with deliberate indifference.[15]

Deliberate indifference and gross negligence are closely associated because conduct constituting gross negligence creates a rebuttable presumption of deliberate indifference. *Doe v. New York City Department of Social Services,* 649 F.2d at 143. This presumption arises from the fact that although gross negligence does not involve any particular mental state or actual state of conscious awareness, it does involve a breach of duty exposing others to obvious danger. Of course, a party is generally presumed to have intended the obvious consequences of his acts. Therefore, when a governmental custodian, through acts constituting gross negligence, exposes someone in his care to danger, it may be presumed he did so intentionally or deliberately.

Deliberate indifference may also be inferred from the failure of a governmental official to perform specific duties required under statute. *Id.* at 146. This inference arises from the fact that duties of governmental officials are generally defined at least in part by state or federal law. Consequently, it is natural to presume that governmental officials will familiarize themselves at least with those statutes which have a direct bearing on their official conduct. However, it is very important to distinguish between those laws which simply create general, vaguely defined duties and those which mandate specific conduct under particularized circumstances. As stated by the Court in *Doe v. New York City Department of Social Services,* 649 F.2d at 146:

> The more a statute or regulation clearly mandates a specific course of conduct, the more it furnishes a plausible basis for

---

**13.** Under the South Carolina Children's Code, *S.C.Code Ann.* § 20–7–640, *et seq.,* it is clear that a child falls under the care of the local child protective agency at the time a report of abuse is received. In this regard, *S.C.Code Ann.* § 20–7–650(C) states, in part: "Within twenty-four hours of the receipt of a report of suspected child abuse or neglect, the agency shall commence an appropriate and thorough investigation...."

**14.** In this case, there are no allegations that movants had specific knowledge of harm suffered by Michael Clark prior to his death. Instead, Plaintiff's Complaint appears limited to the allegation that movants were deliberately indifferent to the welfare of abused children generally.

**15.** In this regard, the Court stated in *Orpiano v. Johnson,* 632 F.2d at 1101, "There is no question about the legal principle that where prison supervisors with *knowledge* of 'a pervasive and unreasonable risk of harm' to the prisoners, fail to take reasonable remedial steps to prevent such harm, their conduct may be properly characterized as 'deliberate indifference'...." (Emphasis added.) Also, in *Doe v. New York City Department of Social Services,* 649 F.2d at 143, the Court stated: "[T]here can be instances where glaring negligence may not constitute deliberate indifference...."

inferring deliberate indifference from a failure to act, even without any specific knowledge of harm or risk. This is because failure to undertake a specific course of action in vindication of a general duty can reasonably be attributed to a bona fide difference of opinion as to how the duty should be performed. However, no such alternative explanation for nonfeasance can be raised where the task mandated is specific and unequivocal.

Based on the affidavits submitted, clearly it cannot be established that movants, through the training of protective service caseworkers, acted with deliberate indifference to the welfare of children receiving protective care. In order to prove deliberate indifference, Plaintiff must establish that movants were aware of serious inadequacies in the training program which posed known risks to protective service recipients but declined to take available action to remedy these inadequacies.[16] Of course, as previously stated, knowledge of inadequacies in the training process and the resulting risks to recipients could be inferred only if movants acted with gross negligence in establishing the training program or violated specific statutory duties. The affidavits conclusively establish that neither actual knowledge, gross negligence nor the violation of specific statutory duties may be proven in this case.

Considering first the relevant statutory duties involved, *S.C.Code Ann.* § 20–7–660(A) states in part: "The Department of Social Services and local agencies shall also, on a continuing basis, *conduct training programs* for local agency staffs...." (Emphasis added.) Neither this statute nor any other code section goes any further than to merely require that a training program be established. There is no attempt to define the types of training required or

to specifically require training in any particular areas. Apparently, the legislature determined that the details of any such training program should be left to the discretion of the Department of Social Services. Consequently, this code section places only a general duty on the Department of Social Services to provide training. Moreover, because the statute does not mandate any specific course of training, an alleged violation of the statute based on a failure to provide sufficient training in a highly specific area, as in this case, simply does not furnish a plausible basis for raising an inference of deliberate indifference.[17]

Further, the concept that deliberate indifference may not be inferred from the failure to undertake a specific course of conduct in furtherance of a general statutory duty is particularly justified under the facts of this case. Unquestionably, there are virtually unlimited areas in which it would be entirely appropriate and beneficial for protective service caseworkers to receive training. The Department of Social Services is ultimately given the responsibility under the law to establish educational priorities by determining which of those areas of training are most acutely needed and may be most effectively provided under the financial restraints faced by the agency. There is much room for reasonable debate and disagreement concerning how priorities should be set. However, when the decision is made and some areas of training are given greater attention at the expense of others, unless there is substantial evidence to the contrary, it should be presumed that the priorities were established in good faith. The fact that some may conclude that insufficient training is provided in a particular area must be attributed to a difference of opinion as to how the duty to train should be accomplished rather than deliber-

**16.** In *Doe v. New York City Department of Social Services,* 649 F.2d at 145, the Court stated:

> Of course, such [deliberate] indifference cannot exist absent some knowledge triggering an affirmative duty to act ... but actual knowledge of a specific harm is not the only type of knowledge that will suffice. Defend-

ants may be held liable under § 1983 if they, or in the case of an agency, its top supervisory personnel, exhibited deliberate indifference to *a known injury, a known risk, or a specific duty....* (Emphasis added.)

**17.** The result might, of course, be quite different had no training at all been provided.

ate indifference on the part of those charged with the duty to make the necessary decisions.

▉▉▉ Also, the affidavits establish that movants had neither actual knowledge of serious inadequacies in the training program nor acted with gross negligence from which actual knowledge could be inferred. Movants deny that the training program is inadequate. In support of movants' position that the training program was not inadequate, affidavits were submitted by Wayne Holder, an expert in the field of caseworker training, and by two high-ranking officials in the State Department of Social Services. None of the three affidavits acknowledges the existence of serious inadequacies in the program. In fact, Mr. Holder stated explicitly that the training program provides protective service caseworkers with the knowledge and skill to properly perform their jobs. In response, Plaintiff has submitted the affidavits of three former certified protective service caseworkers who, having attended the training program, maintain that it is inadequate to provide necessary skill and knowledge to locate transitory or evasive families. However, there is no indication that these caseworkers communicated their concerns about the inadequacy of the training to movants prior to Michael Clark's death. Consequently, there is no evidence in the record indicating movants had knowledge of inadequate training. Therefore, in order to establish deliberate indifference, it must be shown that movants acted with gross negligence in failing to provide more effective training. In order to prove gross negli-

gence based on an alleged failure to provide proper training, it is necessary to show that a resulting pattern of injuries occurred which should have placed movants on notice of inadequacies in the training program. *Withers v. Levine,*[18] 615 F.2d at 161; *Orpiano v. Johnson,* 632 F.2d at 1101. Absent a prior pattern of injuries, gross negligence may be established only by showing that the alleged inadequacies in training were so extreme that Plaintiff's injury was an "almost inevitable" consequence. *Leite v. City of Providence,*[19] 463 F.Supp. 585, 590 (D.R.I. 1978); *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.1979).

In an apparent attempt to establish a prior pattern of injuries, Plaintiff submitted a document prepared by the South Carolina Attorney General's Office entitled "Report of Investigations of Circumstances Surrounding the Deaths of Certain Children in South Carolina Directly Resulting from Physical Abuse and Neglect or Abandonment." As stated previously, this document is a report of an investigation into the deaths of ten children in the state in which the actions taken by local Department of Social Services officials were criticized. However, under close examination, this report is insufficient to establish a prior pattern of injuries.

The report involves an investigation into the actions undertaken by local Department of Social Services agencies in five cases[20] arising throughout the state over nearly a three-year period. Significantly, each case arose in a different county involving different local Department of Social Services officials. There was no indication of repeated

---

**18.** In *Withers* the Court stated:

A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution.... It is enough that violence and sexual assaults occur ... with sufficient frequency ... to *reasonably apprise* prison officials of the existence of the problem and the need for protective measures. (Emphasis added.)

**19.** In *Leite* the Court stated:

Although a city cannot be held liable for simple negligent training of its police force,

the city's citizens do not have to endure a "pattern" of past police misconduct before they can sue the city under Section 1983. If a municipality completely fails to train its police force, or trains its officers in a reckless or grossly negligent manner so that future police misconduct is *almost inevitable,* the municipality exhibits a "deliberate indifference" to the resulting violations of a citizen's constitutional rights. (Emphasis added.)

**20.** In one case, six of the ten children who were the subject of this report died in a fire in their home while their mother was apparently away.

malfeasance or nonfeasance on the part of a particular local agency. Most importantly, however, these cases do not involve repeated errors of the same nature.

The report into the Michael Clark case indicates that his death was not prevented because of the failure of a protective service caseworker to locate his home address after a report was received of child abuse concerning his brother. Also, it appears this failure may have resulted from a lack of familiarity with available sources in the county from which a current address could have been obtained. Yet of the five cases examined, the Michael Clark case was the only one in which an inability to properly locate transient families was identified even indirectly as a potential problem. Consequently, prior to Michael Clark's death, none of these cases constituted a pattern of injury from which movants should have been placed on notice of this potential inadequacy in the training program. Instead, this case represents a tragic but nonetheless isolated incident, insufficient to support a finding of gross negligence.

■ Moreover, it cannot be reasonably argued that the training program provided was so grossly inadequate that the death of protective service recipients should have been anticipated as an almost inevitable consequence. As stated in the affidavit of Wayne Holder, South Carolina provides greater training than is currently provided by a majority of states.[21] Also, the current training program was originally developed by the AHA under contract with the State Department of Social Services. The AHA is currently the oldest and one of the most widely recognized national organizations involved in the development of programs and

services on behalf of neglected and abused children.[22] There is nothing before the Court from which it could conclude that movants should have foreseen that the AHA would develop a training program so grossly inadequate as to almost inevitably result in preventable death. Consequently, summary judgment is granted in movants' favor.[23]

## IMMUNITY

The caseworker or caseworkers who had personal involvement in the Michael Clark investigation do not stand on the same legal footing as movants. This is not to suggest that the Court has an opinion concerning the merits of any claim asserted against a caseworker. However, under the circumstances involved in this claim, solely from a legal perspective, the charge that movants are liable for deliberate indifference in training caseworkers must be treated differently from the charge that caseworkers acted with deliberate indifference in the investigation of Michael's case.

■ The basis for this distinction is found primarily in the fact that state statutory law concerning the investigation of suspected child abuse cases is much more specific than the law dealing with the training of caseworkers. As stated previously, the state law concerning training merely creates a general, vaguely defined duty to "conduct training programs" without specifying the areas or types of training required. On the other hand, the obligations of protective service caseworkers involved in the investigation of suspected abuse cases are specifically defined in *S.C.Code Ann.* § 20–7–650 which states, in part:

21. See affidavit of Wayne Holder, ¶¶ 11–12.

22. *Id.* at ¶ 2.

23. To the extent that Plaintiff's Complaint alleges a claim against the Boards of the State and Anderson County Departments of Social Services as opposed to the members of those Boards in their individual capacities, these claims also must be dismissed as barred by the eleventh amendment. The State Department of Social Services functions as the alter ego of the state, making it immune from suit in federal court. *See Jensen v. Conrad,* 570 F.Supp. 114 (D.S.C.1983); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Moreover, based on the affidavit of John Crosscope, the Interim Commissioner of the State Department of Social Services, it is clear that the Anderson County Department of Social Services is merely an arm of the State Department of Social Services, also immune from suit.

(C) Within twenty-four hours of the receipt of a report of suspected child abuse or neglect, the agency shall commence an appropriate and *thorough* investigation *to determine whether a report of suspected child abuse or neglect is "indicated" or "unfounded". The finding shall be made no later than sixty days from the receipt of the report. In conducting the investigation if the facts so warrant the agency investigator may petition the Family Court of the appropriate judicial circuit for a warrant to inspect the premises and condition of the child subject of the report.* The Family Court shall issue the inspection warrant upon probable cause to believe the child is abused or neglected, as defined by this article. (Emphasis added.)

Although every feature of an appropriate abuse investigation is not expressly enumerated in Section 20–7–650, taken as a whole, the statute places very specific duties on the caseworker assigned to an investigation. Not only does the statute create strict guidelines under which an investigation must be commenced and completed, it is also fairly specific with respect to the type of investigation which should be conducted. Particularly, an investigation is to be conducted to determine whether there is reasonable cause to suspect that a child has been abused by members of his household. To better enable the caseworker to perform his duty, a warrant may be obtained from the Family Court authorizing physical examination of a child and inspection of the home. On a finding of reasonable cause to believe a child has been physically, mentally, or sexually abused, protective services must be initiated and the Family Court notified within one week. *S.C.Code Ann.* § 20–7–650(H). If services are declined, the Family Court may be petitioned to forcibly intervene. *Id.* at (J). Consequently, because this statute mandates a specific course of conduct to be performed under particularized circumstances, violations of the statute by protective service caseworkers engaged in an abuse investigation may

raise an inference of deliberate indifference. *Doe v. New York City Department of Social Services,* 649 F.2d at 146.

■ Moreover, the specificity of the statute dealing with abuse investigations forms the basis for another important distinction between the legal positions of movants and caseworkers. In the recent case of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 2738–39, 73 L.Ed.2d 396 (1982), the United States Supreme Court held that public officials sued in their individual capacities for damages under Section 1983 are entitled to good faith immunity from suit unless their alleged actions violated law which was "clearly established" at the time. Prior to *Harlow,* in order to establish immunity, a public official was required to prove he acted in both objective and subjective good faith. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Objective good faith required a showing that the official neither knew nor reasonably should have known his actions violated federal rights. On the other hand, subjective good faith required a showing that, regardless of what the official should have known, he did not act with malicious intent toward plaintiff or indifference toward his rights.

In *Harlow,* the Supreme Court rejected the subjective element requirement finding that only an objective requirement need be satisfied in order to establish good faith immunity. Further, the Court indicated that the objective element should be analyzed in terms of whether the right allegedly violated was a clearly established right at the time of the alleged violation. In other words, an official may be held to actual or constructive knowledge only of those rights which were clearly established at the time. The basis of this ruling seemed to be the Court's concern that the subjective element of good faith immunity served to unnecessarily block entry of summary judgment in favor of public officials even with respect to those cases constituting insubstantial claims.[24]

**24.** The Court stated:

The subjective element of the good faith de-

Further, the Court adopted the "clearly established law" test primarily to shield public officials from unfair liability. Public officials should not be expected to forecast future developments in the law. The fear of changing legal interpretations and the establishment of rights not previously recognized should not be allowed to rob officials of flexibility in performing their duties. *Harlow v. Fitzgerald,* 102 S.Ct. at 2739. Consequently, in order to avoid punishing officials for subsequent developments in the law, protect flexibility and limit insubstantial lawsuits, public officials are liable only for violations of clearly established law of which they should have had notice.

Applying this test to the present case, it appears that the Board members of the State and Anderson County Departments of Social Services are immune from suit. At the time of Michael Clark's death, the meaning of Section 20–7–660(A) requiring movants to "conduct training programs," having not been specifically defined, was not clearly established. Nor was there clearly established case law defining a general due process training requirement in this area.[25] Therefore, movants are entitled to good faith immunity since the training program they provided was not in violation of clearly established law constituting reasonable notice of possible liability.

The same argument, however, cannot be made in favor of the caseworkers. The obligations of protective service caseworkers are specifically defined in Section 20–7–650. The requirements which must be satisfied are clearly established, thereby providing proper notice. Therefore, caseworkers who act in violation of these requirements cannot be reasonably held to have acted in "good faith." None of the purposes behind the *Harlow* objective good faith immunity rule would be served by such a decision. When a governmental official acts in violation of a specific statute which has a direct bearing on his official conduct and of which it is reasonable to expect him to be knowledgeable, a resulting lawsuit cannot be reasonably characterized as "insubstantial." Nor will holding that official liable in such a case constitute unfair punishment or place undesirable restraints on his flexibility.[26]

---

fense has frequently proved incompatible with our admonition in *Butz* [*Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)] that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment. (Footnote omitted.) And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.

102 S.Ct. at 2737–38.

**25.** *Doe v. New York City Department of Social Services,* the first directly analogous case in this field, was decided approximately one year after Michael's death.

**26.** This is not to suggest that a violation of a state statute alone may constitute a cause of action under Section 1983. In order to establish a claim under Section 1983, it is necessary to prove a violation of constitutional or federal statutory rights. *Maine v. Thiboutot,* 448 U.S. at 1 [100 S.Ct. at 2502]. However, where a *specific* state statute is violated, good faith immunity will not serve as a defense to a subsequent Section 1983 claim.

This Court recognizes that some may argue that good faith immunity may be established under *Harlow* even in the face of blatant violations of state law unless there is a corresponding "clearly established" *federal* statutory or constitutional right. This argument, however, is rejected by this Court on the basis that the purposes behind the *Harlow* decision would not be served in such a case. Further, the plain wording of *Harlow* does not support such an interpretation. In *Harlow* the Court stated:

We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established *statutory or constitutional rights* of which a reasonable person would have known. (Emphasis added.)

102 S.Ct. at 2738.

. . . .

Where an official could be expected to know that certain conduct would violate *statutory or constitutional rights,* he should be made to hesitate . . . . (Emphasis added.)

*Id.* at 2739.

Therefore, in conclusion, summary judgment is entered in favor of the members of the Boards of the State Department of Social Services and the Anderson County Department of Social Services based on the affidavits submitted by the parties and the objective good faith immunity rule created in *Harlow*. This same reasoning, however, does not create a basis for entry of summary judgment in favor of caseworkers personally involved in the Michael Clark investigation. Presently, it is not possible to determine from Plaintiff's Complaint which caseworkers were actually involved in the investigation of this case. Consequently, Plaintiff is given 15 days from the receipt of this Order to file a more detailed complaint against Kenneth Pryor, Dawn Hawkins, and Susan Straup, particularizing their individual involvement in the Michael Clark investigation.[27]

Finally, the parties may now proceed with discovery, which was temporarily stayed pending the issuance of this Order.

AND IT IS SO ORDERED.[28]

## MOTION FOR RECONSIDERATION

This matter is before the Court on Plaintiff's motion for leave to file an Amended Complaint pursuant to Fed.R.Civ.P. 15(a). Also, pursuant to Fed.R.Civ.P. 59(e), Plaintiff seeks to alter or amend this Court's Order of June 16, 1983, granting summary judgment in favor of all members of the Boards of the State and Anderson County Departments of Social Services. Finding no merit to either motion, both are denied.

Plaintiff's initial Complaint was filed on August 16, 1982. Shortly thereafter, various defendants sought dismissal pursuant to Fed.R.Civ.P. 12(b)(6) alleging Plaintiff had failed to state a cause of action. At the conclusion of a hearing held by this Court to consider these motions, Plaintiff was instructed to file more detailed allegations. Upon receipt of these allegations, the parties were notified that the Court would construe Defendants' pending motions to dismiss as motions for summary judgment. Both sides were then provided a full opportunity to file supporting affidavits and supplemental briefs. This Court subsequently granted summary judgment based on the affidavits submitted.

In essence, Plaintiff now seeks to escape summary judgment by filing new pleadings.[1] Also, Plaintiff offers additional affidavits and exhibits not previously filed in response to the motion for summary judgment which are now alleged to raise a genuine issue of fact. However, it is clear that summary judgment cannot be circumvented in such a manner.

■■■■ Once summary judgment is granted against a party, the case cannot be reopened by filing new pleadings unless the judgment is first set aside or vacated. 6 Wright & Miller, *Federal Practice and Procedure:* Civil § 1489; *see also, Sachs v. Snider*, 631 F.2d 350 (4th Cir.1980); *Chrysler Corp. v. Lakeshore Commercial Finance Corp.*, 66 F.R.D. 607 (E.D.Wis.1975). Moreover, summary judgment will generally not be altered or vacated on the basis of supplemental exhibits or affidavits filed after summary judgment is granted. *See De-Long Corp. v. Raymond International, Inc.*, 622 F.2d 1135 (3d Cir.1980); *Clarke v. Montgomery Ward & Co.*, 298 F.2d 346 (4th Cir.1962). This is particularly true in a case such as this where the party seeking to amend judgment has made absolutely no showing that the additional evidence offered could not have been timely submitted

---

**27.** All three of these defendants have a motion for summary judgment presently pending based primarily on the same grounds as the Board members. After receipt of more detailed allegations from Plaintiff, these defendants may, of course, renew their motions for summary judgment on other grounds.

**28.** Plaintiff's Supplemental Memorandum dated May 17, 1983, was not considered by the Court

in this Order granting summary judgment because it was not timely filed. However, it does not appear that this Memorandum would have affected the Court's decision.

**1.** Given the fact that this Court previously ordered Plaintiff to file additional pleadings, this would constitute Plaintiff's third Amended Complaint in this case.

in the exercise of reasonable diligence.[2] Consequently, Plaintiff is denied leave to file an Amended Complaint and this Court's prior Order granting summary judgment is reaffirmed.[3]

In reaffirming this Order, further discussion is warranted in two areas. (1) Defendants' motion for summary judgment raised difficult issues concerning good faith immunity from suit under *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), which were resolved by this Court after exhaustive consideration. This Court has since discovered additional authority to support its conclusions on these issues. (2) Recently, on reconsideration, Judge Clyde H. Hamilton of this District, dismissed a claim based on facts very similar to the facts involved in this case due to a lack of state action. *See Jensen v. Conrad,* 570 F.Supp. 114 (D.S.C.1983). Consequently, it is now incumbent on this Court to elaborate on its reasoning for not dismissing this case on the same basis.

### IMMUNITY

Summary judgment was granted in favor of all members of the Boards of the State and Anderson County Departments of Social Services based in part on the *Harlow* good faith immunity rule.[4] In *Harlow,* the United States Supreme Court held that public officials sued in their individual capacity for damages under 42 U.S.C. § 1983 are entitled to good faith immunity from suit unless their actions violated "clearly established" law. This Court found that the alleged failure of Department of Social Services Board members to provide protective service caseworkers with effective training in a specific area of expertise did not allege a violation of clearly established federal or state law. However, the claim that caseworkers personally assigned to a child abuse case failed to complete a proper investigation was found to allege a violation of clearly established state law. Moreover, this Court held that a state official who acts in violation of clearly established state law which has a direct bearing on his official conduct, may not assert good faith immunity as a defense to a subsequent § 1983 action.[5]

The question of whether a state official who acts in violation of clearly established state law may be entitled to the protection of good faith immunity was specifically addressed in *Williams v. Treen,* 671 F.2d 892 (5th Cir.1982).[6] After thorough analysis of the policy objectives which prompted recognition of the good faith immunity defense, the Fifth Circuit ruled that state officials who violate clearly established state law are not entitled to this protection. Specifically, that court stated:

> We believe that prison ". . . officials are charged with knowledge of their own

---

2. Plaintiff was given ample opportunity to submit responsive briefs, exhibits and affidavits before summary judgment was granted. Had more time been necessary, Plaintiff was certainly free to petition the Court for an extension. No such motion was made.

3. To the extent that Plaintiff's motion to alter or amend the judgment can be construed to be based on allegations of error, this Court finds no merit in Plaintiff's claim.

4. The Court also granted summary judgment based on the merits of the case prior to considering Defendants' immunity claim.

5. This Court did, of course, recognize that a mere violation of state law would not constitute a cause of action under § 1983. To establish a claim under § 1983, it is necessary to prove a violation of constitutional or federal statutory rights. In this regard, the Court found the claim that protective service caseworkers had acted with deliberate indifference in failing to protect a child from obvious and preventable dangers alleged a violation of the due process clause of the fourteenth amendment. *See Doe, v. New York City Department of Social Services,* 649 F.2d 134 (2d Cir.1981). Moreover, the fact that a constitutional right to such protection was not clearly established at the time of the child's injuries was held not to constitute a defense to the claim since the caseworkers were allegedly acting in violation of clearly established state law.

6. The Court stated: "We are therefore confronted with what appears to be a question of first impression in this Circuit. We must determine whether 1983 defendants are entitled to the protection of a qualified immunity when there has been a violation of clearly established *state* law." *Williams v. Treen,* 671 F.2d at 899.

prison regulations." *Chavis v. Rowe,* 643 F.2d 1281, 1289 (7th Cir.1981) and that they "may not take solace in ostrichism." *Id.* If an official's conduct contravenes his own state's explicit and clearly established regulations, a subjective belief in the lawfulness of his action is *per se* unreasonable.... To hold otherwise would be to encourage official ignorance of the law.

We of course recognize that a § 1983 plaintiff must allege a deprivation of a federally protected right in order to set forth a *prima facie* case, *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); violation of state law alone does not give rise to a cause of action under § 1983. *Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980). We believe that our conclusion regarding the immunity defense in this case is entirely consistent with this well established principle. The § 1983 cause of action in this case is based upon the fact that the federal constitutional rights of these inmates were violated.... At this juncture, the only question before the court is whether the defendant officials are entitled to the special protections of a qualified immunity. We hold that when a state official violates the constitutional rights of a citizen, and in so doing also violates clearly established state law which enforces those rights, the defendant official is not entitled to an immunity which is based upon reasonable good faith.

*Williams v. Treen,* 671 F.2d at 899–900.

### STATE ACTION

In examining the issue of whether state action exists in this case, it is important to carefully consider the alleged basis for liability. On June 23, 1980, Michael Clark, a three-year-old child, was apparently beaten to death by the live-in boyfriend of Michael's mother. Four months previously, the Anderson County Department of Social Services had received a report of child abuse in Michael's family. However, the protective service caseworkers assigned to investigate that incident allegedly failed to conduct a proper abuse investigation in violation of specific requirements of state law. Failing to make contact with Michael's family, the Complaint alleges that the protective service caseworkers simply classified the report as "unfounded" and the case was officially closed. Consequently, due to alleged deliberate indifference on the part of state officials, Michael was abandoned to a clearly abusive home life, making subsequent injury virtually inevitable.[7]

Under these circumstances, because Michael was killed by a private party not under state supervision or control, it might be argued that there was no state action which significantly contributed to his death. Certainly state officials did not affirmatively act to harm him. However, such an argument ignores the fact that had the protective service caseworkers properly performed their duties in accordance with state law, Michael's death could possibly have been prevented. In other words, state officials may have been responsible for Michael's death due to their conscious inaction rather than because of any affirmative conduct.

It is an established principle of law under § 1983 that state officials may be held liable for damages resulting from their failure to perform official duties. In this regard, police officials are liable for purposeful failure to protect individuals who, through the exercise of constitutional rights, are endangered by resulting mob violence. *See Downie v. Powers,* 193 F.2d 760, 764–65 (10th Cir.1951).[8] Furthermore,

---

7. Because of the current posture of this case, the Court is required to view the facts in a light most favorable to Plaintiff. Of course, this should not be construed to indicate that the Court has reached any conclusions concerning the merits of the claim against the caseworkers.

8. In *Downie* the Court stated:

   One charged with the duty of keeping the peace [under state law] cannot be an innocent bystander where the constitutionally protected rights of persons are being invaded. He must stand on the side of law and order or be counted among the mob.... But

state officials must enforce the law in a non-discriminatory manner. For example, they may be held liable under § 1983 for purposeful failure to protect unpopular minorities. *See Smith v. Ross,* 482 F.2d 33 (6th Cir.1973); *Catlette v. United States,* 132 F.2d 902 (4th Cir.1943).[9] Therefore, the conscious failure of state officials to perform statutorily imposed duties without justification in itself constitutes state action.

■ It is clear, however, that the mere fact that some state action was involved in Michael's death does not entirely resolve the state action issue. In order for an injury to be actionable under § 1983, there must have been sufficient state action so that state officials may be fairly held responsible. Defendants have argued, based on *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), that Plaintiff has failed to allege sufficient state action to maintain a claim under § 1983.

In *Martinez,* a § 1983 action was brought against members of the California Parole Board on behalf of a 15-year-old girl who was murdered by a parolee five months after he was released from prison. This claim was based on the allegation that the Board's action in granting parole, despite the parolee's history as a sex offender, had caused the loss of the girl's life without due process of law. In dismissing this case for a lack of state action, the Supreme Court stated: "[D]ecedent's death is too remote a consequence of the parole officers' action to hold them responsible under federal civil rights law." *Martinez v. California,* 444 U.S. at 285, 100 S.Ct. at 559. However, this conclusion appeared to be based primarily on the finding that "the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger."[10] *Id.*

■ Of course, the facts of the present case are readily distinguishable from the facts in *Martinez.* Unlike the parole officers in *Martinez,* the protective service caseworkers in this case were allegedly aware that particular individuals (*i.e.,* the children in the Clark family), "as distinguished from the public at large," faced special danger (*i.e.,* physical abuse by their guardians).[11] Moreover, the caseworkers were hired specifically to protect children such as Michael from this particular "special danger." As public officials, they were required to perform specific statutory procedures designed to prevent child abuse. *See S.C. Code Ann.* § 20–7–650(C). Allegedly, these procedures were not followed and a proper investigation was never completed. Under these circumstances, it would simply be unreasonable to characterize Michael's death as "too remote a consequence" of the caseworkers' alleged failure to perform their official duties. Viewing the facts in a light most favorable to Plaintiff, Michael's death was a direct and highly predictable consequence

---

the officials are the keepers, not the insurers of the peace in the community. Diligent and conscientious effort is all that is required....

When all the evidence bearing upon the action *or inaction* of the city officials is considered in its totality we think it presented a factual issue.... (Emphasis added.)

*Downie v. Powers,* 193 F.2d at 764.

**9.** In this regard, the Court stated:

We agree with appellants that a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection to persons legitimately exercising rights guaranteed them under state or federal law. *Acts of omission are actionable in this context to the same extent as are acts of commission.* (Emphasis added.)

*Smith v. Ross,* 482 F.2d at 36–37.

In *Catlette,* the Court stated: "It is true that a denial of equal protection has hitherto been largely confined to affirmative acts of discrimination. The Supreme Court, however, has already taken the position that culpable official State inaction may also constitute a denial of equal protection." *Catlette v. United States,* 132 F.2d at 907.

**10.** The Court also considered the fact that the parolee was not an agent of the Parole Board and the murder had occurred five months after his release. *Martinez v. California,* 444 U.S. at 285, 100 S.Ct. at 559.

**11.** This distinction was recognized by Judge Phillips in a recent Fourth Circuit opinion. *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983).

of official inaction for which the caseworkers may be fairly held accountable under § 1983.[12]

■ It is, of course, clear that a claim may not be asserted under § 1983 on the basis of state action alone. To establish a claim under § 1983, it is also necessary to prove a violation of federal constitutional or statutory rights. Defendants argue that, even in the presence of state action, Plaintiff's claim must be dismissed due to a failure to allege a violation of federal rights.

■ In this regard, Defendants cite *Bowers v. DeVito,* 686 F.2d 616 (7th Cir. 1982), which held generally there is no right to state protection against criminal conduct. Consequently, since there is no "constitutional duty [on the state] to provide such protection its failure to do so is not actionable under Section 1983." *Bowers v. DeVito,* 686 F.2d at 618. However, in recently accepting this principle in *Fox v. Custis,* 712 F.2d 84, 88–89, the Fourth Circuit also recognized an important exception. Although the state has no constitutional duty to protect members of the general public from random criminal violence, a constitutional right to affirmative protection by the state may arise out of special relationships "created or assumed by the state in respect of particular persons." *Fox v. Custis,* 712 F.2d at 88.

Unfortunately, the Court in *Fox* did not specifically define the type of "special relationship" which may give rise to a right to protection vindicable under § 1983.[13] However, it is difficult to imagine a relationship more special than that assumed by the state with respect to children reported to the Department of Social Services as suspected victims of abuse. This is particularly clear in light of the exhaustive statutory procedures adopted by the state specifically mandating a rapid and detailed investigation of every report. Based on these statutory procedures, it is clear that this state has assumed a special protective relationship with respect to such children.

■ It is important to realize, however, the mere failure of protective service caseworkers to follow these procedures and offer appropriate protection due to negligence or inadvertence, even in light of this special relationship, does not state a claim under § 1983. To establish liability under § 1983, Plaintiff must prove that Defendants acted with "deliberate indifference." *See Doe v. New York City Department of Social Services,* 649 F.2d at 134. In essence, this requires a showing that Defendants, with actual knowledge that Michael faced a pervasive and unreasonable risk of harm, failed to provide reasonable protection due to a conscious lack of concern for his safety.[14] Conduct of this type, in violation of

12. It is also important to recognize that another significant distinction can be made between the facts in *Martinez* and the facts in this case. In *Martinez,* the Parole Board was performing a discretionary risk-assessing function. A strong argument can be made that in order to provide the members of the Parole Board with the necessary flexibility of judgment to properly perform such a function, they must be given significant protection from suit. However, in the present case it is alleged that the caseworkers failed to perform mandatory functions. In performing mandatory functions, flexibility of judgment is not generally required and, therefore, immunity from suit is not justified.

The mandatory abuse investigation required under South Carolina law is designed to collect information concerning suspected abuse cases. This information may subsequently be utilized by the Department of Social Services in performing discretionary functions, such as deciding whether to attempt to terminate parental

rights. When making this sort of determination, a strong argument could be made that the Department of Social Services also needs protection from lawsuits in order to function properly.

13. In this regard, the Court stated:

Without attempting a general definition of the special relationship required to give rise to a right, vindicable under § 1983, to affirmative protection by the state, it suffices to observe that none is claimed or appears here. *The claimants here were simply members of the general public, living in the free society, and having no special custodial or other relationship with the state.* (Emphasis added.) *Fox v. Custis,* 712 F.2d at 88.

14. Although "deliberate indifference" may be presumed from violations of specific statutory law or acts of gross negligence, this is merely a permissible inference or presumption. As

statutory law and a duty of protection clearly assumed by the state, is sufficiently offensive to traditional notions of fundamental fairness and substantial justice to violate the due process clause of the fourteenth amendment.

Consequently, this Court's prior Order of June 16, 1983 is reaffirmed.

AND IT IS SO ORDERED.

such, the inference is sufficient to avoid entry of summary judgment or directed verdict. However, it does not result in a shifting of the burden of proof or require any specific response from Defendants. In the final analysis, a jury would have to conclude that Defendants acted with *actual knowledge* and a *conscious lack of concern* in order to return a verdict in Plaintiff's favor.